HENDRICKSON v. The JAMES GESNER. See Case No. 6,356.

HENDRICKSON (SELDEN v.). See Case No. 12,639.

## Case No. 6,358.

### The HENDRIK HUDSON.

[17 Law Rep. 93; 2 West. Law Month. 343.]

District Court, N. D. New York. Feb., 1855.

MARITIME LIEN—VESSEL UPON THE GREAT LAKES — POWER OF MASTER TO CREATE SUCH LIEN — CONTRACT OF AFFREIGHTMENT—CUSTOM—CHATTEL MORTGAGE—ORDER OF PRIORITY.

1. By the custom existing at the ports of the great northern and northwestern lakes, the

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 17 How. (58 U. S.) 443.]

master of a steamboat or vessel, employed as a general ship, has, by virtue of his office of master, full authority upon the receipt of merchandise and other property on board his vessel subject to a lien for prior freight and charges of carriers and warehousemen for previous transportation, storage, &c. of such merchandise and property whilst on its way to its ultimate destination, to contract, in and by his bill of lading, to receive and transport such merchandise and property, to its port of destination; to receive such prior freight and charges on the delivery of such merchandise and property; and to bring back and pay over to such shipper, on the return of his vessel, the moneys received for such prior charges; if such is the ordinary course of the usual employment of such steamboat or vessel.

2. The evidence produced in this case fully established the existence of a custom for the masters of steamboats and vessels to make such a contract; and that such custom had been generally known, for fifteen years or more, by shippers and forwarders, and by the masters and owners of vessels engaged in the business of such lakes. It was therefore *held* that such a contract, made by the master, in this case, bound his vessel, and owners, to its performance.

3. Such a custom is reasonable and lawful; and such a contract, when authorized by a well known, long established and universal custom, and made by the master in the course of the usual employment of his ship, is binding, not only against himself and his owners in personam, but also against his vessel in rem; and not only against the interests of the general owners in the vessel, but also against the interests of other parties having common law liens; or having maritime liens, which from their nature and character, or the time of their creation, can be affected by the lien of the shipper, to whom the ship, in specie, is bound by such contract.

4. It seems such a contract, when made by the master, by virtue of a special and extraordinary authority from the ship owner, and without any known or general custom to authorize it, would not confer a lien on the ship binding upon mortgagees or others having liens; and that a lien, binding on mortgagees, &c., can only exist when the custom is such that the authority of the master to make the contract results from, and is conferred by, his mere appointment as master of the ship, without the delegation of other authority, than such appointment, per se, confers.

5. The ship, in specie, is, by the general maritime law, bound to the performance of all contracts made by the master in the usual course of the employment of the vessel, and the contract made by the master in this case being authorized by the custom, bound the ship to its performance, and the shipper had a maritime lien upon the ship, for his security, which lien can be made available by a proceeding in rem in the admiralty.

6. Such an admiralty lien, (like all other maritime liens,) is a privileged hypothecation, and takes preference of all liens and debts not privileged; and it is entitled to its proper place, in regard to its preferences and priority, amongst other privileged debts secured by a marine hypothecation of the same vessel.

7. An ordinary common law chattel mortgage upon a ship or vessel, though given for the purchase-money, and filed and recorded, as required by the law of the state to which the vessel belongs, and the law of the United States, prior to the making of such a contract as was made in the present case, does not entitle the mortgagee to claim the surplus of the proceeds of a ship sold under the process and decree of a court of admiralty, in preference to the privileged creditor who has a maritime lien under a

bill of lading containing such a contract for the receipt, return and payment of the prior charges on merchandise and property laden on board a general ship, under such a custom as was proved in this case.

The steamboat Hendrik Hudson, her tackle, apparel and furniture, were libelled by the Michigan Southern Railroad Company, for the recovery of the amount due them for certain charges of transportation, which were a lien upon sundry different packages, parcels, articles of merchandise, and other property, which the libellants, in the ordinary course of their business, had received and transported upon their railroad while such merchandise and property were on their way to their ultimate destination; and which merchandise and property the railroad company had delivered, subject to the lien thereon for such charges, on board the Hendrik Hudson, in the month of November, 1852, for further transportation to, or towards, the point of final destination. At the several times of the delivery of the merchandise and property referred to on board the Hudson, the master executed and delivered to the railroad company, as the shippers of such merchandise and property, the usual bills of lading therefor. The captions of all these bills of lading were in the following form:—"Shipped, in good order and condition, by the Michigan Southern Railroad Company, on board steamer Hendrik Hudson, whereof Goldsmith is master, the following property, as here marked and described, to be delivered in like good order and condition, (dangers of navigation excepted,) as addressed on the margin, or to his or their assigns or consignees, only upon the payment of the freight, transportation and charges as noted below, which said carriers undertake to collect, return and pay." Following these captions, there was contained in each bill of lading the usual statement of the property laden on board the steamer, with the marks thereon, and the names of the owners or consignees, and also a statement of the prior charges to which the shippers were entitled, as well as the rate or amount of the steamer's freight; and at the end of each bill of lading, were the letters "C. C.," or the words "Capt. Collect," or "Capt. Collect, and pay J. H. Raynor;" thereby indicating that the master of the Hudson was authorized to collect such prior charges, and to whom they were to be paid, at the port of destination, in the cases where they were not to be returned to the shippers. It was satisfactorily proved by the concurring testimony of persons who had been engaged in business upon the lakes, as forwarders, shippers and vessel-owners, from nine to twenty-seven years, that the letters "C. C.," or the words "Capt. Collect," in such a bill of lading, by the known and universal custom and usage of the lakes, were understood to mean that the ship-master who executed such a bill of lading was to collect the prior freight and charges mentioned in

the bill, (and which follow the property,) and return and pay over the amount of such prior freight and charges to the shippers; and that by such usage and custom it was the master's duty to do so; that sometimes directions were given in such bills of lading for the captain to collect the prior freight and charges, and pay them over to some agent at the port of destination, in which case a direction, similar to that in some of the bills of lading in this case directing payment to be made to J. H. Raynor, was given; and that in such cases it was the duty of the master, by the universal custom of the lakes, to collect such prior freight and charges, and pay them over as directed; that shippers sometimes received from the master of a vessel the amount of these prior charges at the time of the shipment of the property on which they were a lien, and then collected them at the port of delivery; but that this advance of the prior charges was not often required; and that property was generally shipped under a bill of lading, like those shown in this case, with the understanding and agreement that the prior freight and charges were to be received by the master of the vessel on the delivery of his freight, and paid over to the shipper's agent, or returned and paid over to the shippers themselves on the return of the vessel, according to the direction and agreement of the bill of lading.

It is deemed unnecessary to state in detail the testimony in reference to the custom of the lakes. It is sufficient to state, that it was such as to leave no doubt that the master of the Hudson, at the time of the receipt of the merchandise and property described in the bills of lading under which the libellants claim, contracted, according to the custom and usage of the lake ports, to collect, on the delivery of such merchandise and property, the prior freight and charges mentioned in the bills of lading, and to pay over to the shippers or their agents the amounts received therefor; and that such testimony satisfactorily established the fact, that in consequence of a long-established custom and usage prevailing upon the lakes and their connecting waters, and at the ports thereon, forwarders, shippers, and masters and owners of steamboats and sailing vessels, well understood that the master was fully authorized, under and by virtue of his simple appointment as master, to make such contracts. It was also shown that the Hudson, during the season of 1852, was employed as a general ship, making frequent trips along the southerly shore of Lake Erie; and it was admitted that the goods mentioned in the bills of lading as shipped by the libellants, had been delivered by the master of the Hudson, and the prior freight and charges thereon received by the clerk of the steamer, and that no part thereof had been paid over, though the vessel had returned to the place of shipment after such delivery, and some time before this suit was commenced. The

amount of the libellant's claim was $1,448.50, besides interest.

The claimants, Ansel R. Cobb and Nelson Willard, who had, on special application, been permitted to intervene for their interests and to litigate the claim of the libellants, were mortgagees, holding separate mortgages, upon undivided moieties of the vessel. These mortgages were given to secure part of the purchase-money of the moieties covered by such mortgages respectively. The mortgage under which Cobb claimed was dated April 14th, 1851, and that under which Willard claimed was dated on the 12th day of August, in the same year. These mortgages had been severally duly filed as required by the laws of the state of New York, where the owner of the Hudson, the mortgagor, resided, and they had also been duly recorded in the office of the proper collector of the customs as required by the act of congress. The claimants set up by their answers, and it was conceded at the hearing, that there had been a forfeiture under each of these mortgages, by a breach of its condition, prior to the making of the contracts of affreightment and bills of lading under which the libellants claimed. It was also conceded that they had not taken possession under their mortgages, but that the mortgagor had continued in possession of the Hudson, and had run her on his own account until she was arrested under the process of this court in December, 1852. It also appeared that the Hudson had been sold and the proceeds brought into the registry, and that the amount still remaining in the registry, though sufficient to pay the libellants' claim, was not sufficient to pay the claims of the libellants and claimants.

HALL, District Judge. The contracts made by the master of the Hudson, at the time he received on board his vessel the merchandise and property mentioned in the bills of lading proved in this case, and under which he was to receive the prior freight and charges which were a lien thereon, and to pay over the same as mentioned in the several bills of lading, were unquestionably binding upon the master; and a suit against such master might, undoubtedly, under the circumstances of this case, have been sustained in the common law courts. This was not denied upon the argument, but it was claimed that the master, in respect to these prior charges, was the agent of the shippers and not of the ship owners; and that neither the ship in specie, nor the ship owners were bound to the performance of such contracts. On the other hand it was urged by the libellants that the ship owners and the ship were bound by the master's contract; and that the libellants were entitled to a decree for the payment of their whole claim out of the proceeds of the Hudson still remaining in the registry of the court. In order to charge the owners personally upon such a contract, it is necessary for the libellants to establish the position that the contract

was made by the master as the agent of the owners, and under their authority, either expressly given or tacitly conferred. The general principle that the master of a ship, by the mere force and effect of his simple appointment as such, has an implied authority to bind them, without their knowledge, by contracts relative to the usual employment of a general ship, and also in respect to the means of employing her, is not only reasonable, and founded in just principles of commercial policy, but is too well established by authority to admit of controversy or doubt. 3 Kent, Comm. 161, 163; Abb. Shipp. 124; The Aurora, 1 Wheat. [14 U. S.] 96. The course of the usual employment of the ship is evidence of authority given by the owners to the master to make for them, and on their behalf, all the contracts relating to such employment, and, consequently, a contract so made by him is esteemed in law to have been made by them, and binds the owners as well as the master. Abb. Shipp. 124. In respect to most of the ordinary contracts of the master no proof of his authority to bind his owners, or that the contract relates to the usual employment of his ship, is required, because the universal usage and custom of the commercial world, give to the master full power to bind the owners of his vessel in respect to the matters to which such contracts relate. The authority of the master, in such cases, nevertheless, results from the general usage; and proof of the usage and custom is not required, simply because the usage is so general, so well established, and so familiarly known in courts of admiralty, that they will take judicial notice of its existence, and of the master's authority under it. The authority of a master to bind his owners may be extended by a well established usage and custom in respect to vessels engaged in a particular trade, or between particular ports; and, in such cases, the master, while acting in accordance with the usage and custom, is held to act within the scope of his employment, and his owners are liable for the faithful performance of every duty undertaken by the master in regard to property shipped according to the custom proved. And when it appears to be a part of the duty attached to the employment, and in the usual and ordinary course of business, for the master to sell the cargo for cash, and to bring back the money to the shipper, the owners are liable, although no commission or distinct compensation was to be received therefor. The freight of the cargo is the compensation for the whole service, and upon the violation of any portion of the entire contract a suit may be sustained against the owners of the vessel without other evidence of the master's authority, than such as results from the proof of the custom and of his appointment and acts as master. Emery v. Hersey, 4 Greenl. 407; Kemp v. Coughtry, 11 Johns. 107. But to establish such custom it is not enough to prove, that the acts it is said to authorize have been frequently done. It must be shown to be so generally known and recognized that a fair presumption arises that the parties, in entering into their engagements, do it with silent reference to the custom, and tacitly agree that their rights and responsibilities shall be determined by it. The Paragon [Case No. 10,708]. And this is especially true in a case like the present, where the contract made, in accordance with the custom and under its authority, is to affect the interests of persons not parties to the contract.

The proof of the custom in the present case is ample and conclusive, and under this custom and the authorities above cited, I think it may be considered as established that the owners of the Hudson were liable upon the contracts of the master contained in the bills of lading executed to the libellants, and on which this suit is prosecuted. It is doubtless another question whether shippers are entitled to proceed in rem against the vessel for the defaults of the master when acting in the character of factor, or as agent of the shipper in any matter not directly connected with his duty and employment of master. The Waldo [Case No. 17,056]. But that question is not presented in this case. The master of the Hudson was not constituted the factor or agent of the libellants, in respect to the property shipped by them, nor was he invested with any discretion or authority to act as their agent, or in their behalf. His contract related exclusively to the ordinary and usual employment of his ship. The property shipped, and in respect to which the contract was made, was received from the libellants subject to their lien for their freight and charges, and it was for the purpose of obtaining the shipment of that property on board the Hudson for transportation, and thereby earning freight thereon, without advancing the charges which were a lien on the same, that he agreed to receive such property, subject to such charges, to deliver it only on the receipt of the amount of such charges, and to take and carry the money to be received for such charges to the shippers, or pay it over to the shippers' agents. If the prior freight and charges had been payable in railroad iron, and the contract had been to deliver the property shipped only upon the receipt of the railroad iron due for such charges, and to transport such railroad iron to the wharf of the shippers, and there deliver it for their benefit—and such railroad iron had been received and converted to the use of the master, there would have been little hesitation in saying that the vessel and her owners were liable, and yet I am unable to see any substantial difference in principle between the two cases. In my opinion the contracts on which the libellants proceed, related solely to the ordinary and usual employments of the Hudson, and the master's authority to make these contracts, resulted under the custom and usage proved from his mere appointment as master. By the terms

of these contracts, the master did not agree to act as the agent of the shippers, but he agreed as such master, that the subsequent delivery of the property shipped, which he was to make in the ordinary course of his employment and duty as such master, and which was necessary to be done as a condition precedent to his own right to demand the payment of the Hudson's freight thereon, should not be made until he received the prior freight and charges due to the libellants, and that when he received such freight and charges he would pay them over to the shippers or their agents. In all this he was to act as master of the ship, and as the agent of her owners, in carrying out the contract of affreightment under which he received the property in the bills of lading mentioned, and not as the agent of the shippers. After the master had received the property shipped under this contract, the shippers had no longer any control over the property, or over the master in respect thereto. They could neither require the master to re-deliver the property, or to demand the payment of any larger sums for prior freight or charges than were provided for in the bill of lading; nor could they, in any manner rightfully direct or control the master in respect to any matter connected with the delivery of the property or the receipt of the freight. He had a right to deliver it, even in direct disobedience to the express orders of the shippers; being liable to the shippers only for the payment of the sum he had agreed to pay on account of their lien. It is therefore apparent that the master was in no respect the agent of the shippers, but was the agent of his owners, and that they were liable for his default.

Under the admiralty and maritime law of this country, there are some cases in which the master and owners are liable under the contracts of the master, while the ship in specie is not bound for the performance of such contracts. Such are the cases of contracts for materials and supplies furnished a domestic ship. But the law of this country, as well as the general maritime law, gives a lien upon the ship to secure the performance of the lawful contracts of the master in respect to the shipment and transportation of merchandise and property on freight. Chancellor Kent says (3 Comm. 218), "And it appears very clearly, that by the general maritime law, a lien exist in favor of the merchant, who ships merchandise in a vessel on freight, against the vessel for the nonperformance of the contract of affreightment under the bill of lading entered into by the master, in his quality of master, and that it may be enforced by process in rem. The ship itself in specie is considered as a security to the merchant who lades goods on board of her, and it makes no difference whether the vessel be in the employment of the owner directly, or be let by a charter party to a hirer, who was to have the whole control of her," and so it was held by the learned judge of the Maine district in the cases of The Rebecca [Case No. 11,619]; The Phoebe [Id. 11,064]; The Waldo [Id. 17,056]; and The Casco [Id. 2,486]. [See Poland v. The Spartan, Id. 11,246, and the authorities there cited; The Volunteer, Id. 16,991.] [1] Indeed, by the general maritime law, every contract of the master, within the scope of his authority as master, binds the vessel, and gives the creditor a lien upon it as his security. The Paragon, ubi supra; Abb. Shipp. 124. [But see the cases of The Yankee Blade, 19 How. (60 U. S.) 82; The Freeman, 18 How. (59 U. S.) 188; and the Carrington [Case No. 6,029.] [1]

The principle that the ship and freight are bound for the acts of the master, has been incorporated into the maritime jurisprudence of England, though from the limited jurisdiction of the admiralty, the shipper cannot have the full benefit of it. In this country the lien is not only acknowledged but enforced by our courts of admiralty, and having been borrowed from the general maritime law, or the customs and usages of the sea, we must look to them rather than to our own peculiar maritime jurisprudence for its true character and the cases to which it applies. The Phoebe [supra]. And the learned judge of the district court of Maine, after tracing the principle of this lien back to its source, declares that it is by no means correct to say that the liability of the vessel is merely collateral or accessory to that of the owner. That on the contrary, in the origin of the custom the primary liability was upon the vessel. And it was declared in that case that whoever deals with the master, in all cases where he is acting within the scope of his authority as master, is entitled to look to the ship as his security. In accordance with that principle, it was held in the case of The Phoebe that the ship, although in the hands and under the entire control and management of a charterer, was liable to the shipper for 136 tons of gypsum, of the value of $259.78, shipped on board the vessel for transportation from Eastport in Maine to Boston, and for which bills of lading were executed by the master under an agreement that the master was to have for his freight all the net proceeds of the sales of the gypsum over the sum above mentioned; the master, instead of carrying the gypsum to Boston, having stopped at Castine, transshipped it on board of another vessel, and wholly failed to deliver the gypsum to the consignees.

These authorities are sufficient to show that the ship, at least as against the owners, is liable in specie, for the performance of such contracts as were made by the master in this case. If the personal liability of the owners and the liability of the ship in specie, as against such owners, be fully es-

---

[1] [From 2 West. Law Month. 343.]

tablished, there remains another and more serious question, and one which was more elaborately argued and quite as confidently urged by the learned advocates for the claim-ants. They insisted that the rights of a prior mortgagee, who had filed and recorded his mortgage as required by law, were para-mount to those of a creditor holding a mari-time lien created under a contract of af-freightment made subsequently to the time of the execution, filing and recording of the mortgage; that a subsequent maritime lien, unless for seamen's wages or under a bot-tomry bond, was inferior and subordinate to the common law lien under the chattel mortgage; . and that the common law right of the mortgagee could not be affected or displaced by a subsequent maritime lien and ·proceedings in rem founded thereon, prose-cuted to a decree and sale in a court of ad-miralty.

To maintain their positions, the advocates for the claimants cited the cases of Thomas v. The Kosciusko [Case No. 13,901], and Schu-chardt v. The Angeleque [Id. 12,483a], de-cided by the learned judge of the Southern district of New York, and they claimed that those cases were directly in point, and fully established the doctrine for which they con-tended. The distinguished ability, eminent learning, and great experience of Judge Betts are well known and universally acknowl-edged in this district, and they deservedly give to his opinions almost the force of con-trolling authority in this court; but my pre-conceived opinions, adverse to the positions assumed here by the advocates for the claim-ants, had been so long and steadily enter-tained, that I was not prepared, on the argu-ment and without further examination and reflection, to yield my assent to the doctrines which it is insisted, and no doubt properly in-sisted, are sanctioned by the cases cited. In the case of Thomas v. The Kosciusko [supra], it was held that the libellant had, under the general maritime law, a lien for certain sup-plies furnished the vessel within the district of New York, she then being owned in the state of New Jersey; and that the only de-fence to that portion of the libellant's de-mand depended upon the validity of the mort-gage held by the claimant who had been per-mitted to intervene and defend the suit. The mortgage in that case was held to be inval-id, and the libellant's right to a decree against the vessel, and a priority over the claimant was declared; but it is insisted, and I am inclined to think with good reason, that the language of the court authorizes the inference that the learned judge would have declared that the mortgage lien was to be preferred, if the mortgage had been properly filed and recorded according to law. I am not aware that any written opinion, containing a full statement of the views and reasoning of the court in the case of Schuhardt v. The An-gelique [supra], has ever been published, but the newspaper report states "The court

held," first, "that this court, proceeding on the instance side in actions by material-men, freighters and passengers, against the ship, had no authority to compel the mort-gagees to submit their mortgage interest to the order of the court, or to take satisfaction therefor, even at its full amount, much less to order the discharge of its lien on the ship on payment to the mortgagees of less than the mortgage debt." Second. "That the mortgagees never submitted themselves or their mortgage lien or debt to the jurisdic-tion of this court; but, on the contrary ap-peared at the place and time of the marshal's sale, and gave notice of the subsistence of their legal incumbrance and right against the ship."· Third. "That had such a submis-sion been made, the court of admiralty pos-sesses no power over the creditors or their debts adequate to coerce the parties to an involuntary relinquishment or adjustment of their rights, or ·enabling it to fix .a scale of equities between these numerous .suitors, prosecuting distinct interests, or to compel any of them to forego their entire legal rights and remedies." Fourth. "That the libellants establish no right of action against the fund in court as the res chargeable with their debt, and they are not entitled to ar-rest them, or partake in their distribution as remnants or proceeds of the ship on which they hold an incumbrance, because the court has never displaced that incumbrance from the ship, and because these proceeds are more than absorbed by decrees in court directly against the ship, and they do not, therefore, continue in court, nor are they at the disposal of the court as remnants, so that the court can take cognizance of the equities thereto as between the ship and his creditors." Fifth. "That courts of admiralty have not inherently the faculty to use chan-cery powers or processes to compel creditors to yield legal rights and give place to claims, clothed with no more than an equitable char-acter; nor as a general principle, to act up-on parties or interests not before it by regu-lar course of suit; nor to coerce suitors pur-suing by courts of law the remedies appro-priate to the jurisdiction of the court; nor others, not parties before the court to sub-mit to a marshalling of assets within the control of the court, for the purpose of put-ting equitable claims thereto on the same footing with maritime liens in suit, or legal rights." Sixth. "That as a ·general principle,. debts, resting on a maritime privilege alone, become incumbrances, and bind the res un-der lien when the same is attached thereon, and not before. Accordingly, suitors in ad·miralty take priority of satisfaction in lien debts in the order of the arrest of the prop-erty subject thereto, and not pro rata, nor in the order in which the debts were incurred, nor with reference to the time of indebt-ment, except in the case of express hypothe-cation;" and that the court directed "that the lien creditors, other than the libellants,.

be paid out of the fund in court in the order in which their attachments were liened respectively, and when no attachment was served in suits under prosecution, then in the order in which the actions were instituted." In this case of The Angelique (as I understand the report), the mortgagees were themselves actors, having filed a libel against the proceeds of the vessel, which then remained in the registry, for the purpose of obtaining a decree for their application in payment of the mortgage upon which the proceeding was founded. The vessel had been previously sold under the decree of the court in favor of material-men. The mortgagees had attended the sale, and before the ship was bid off, gave to the marshal and to the bidders and purchasers at the sale, notice of their mortgage incumbrance, and insisted that the ship would still remain subject to their lien, notwithstanding such sale. This, as it has been seen, was one of the grounds upon which their right to a portion of the proceeds was denied; but the statement of the other points decided seems to warrant the conclusion that Judge Betts held that a prior chattel mortgage, duly filed and recorded, would not be affected or defeated by a sale under the decree of a court of admiralty, made in a suit brought to enforce a maritime lien, which attached after the filing and recording of the mortgage—unless, indeed, the mortgagee voluntarily appeared, and submitted himself and his mortgage to the jurisdiction and decree of the court. The case, if I understand it, fully sanctions the doctrine, that such a sale does not extinguish or defeat the lien of such prior mortgage, and that a court of admiralty has no power, when such mortgagee fails to appear, to sell the vessel discharged from the mortgage lien, or to give, (what it has been generally supposed a purchaser obtained at such a sale,) a good title as against the world.

If I have properly understood the points decided in the cases of The Kosciusko and The Angelique [supra], I cannot, after mature deliberation, assent to the doctrine of those cases. In my judgment, a court of admiralty proceeding in rem against a ship, on the instance side of the court, in suits prosecuted by seamen, material-men, bottomry bond holders, freighters, or others holding admiralty liens under the general maritime law, have a clear and undoubted right to decree, and do ordinarily decree, a sale of the ship free from all previously existing incumbrances, and that such a sale extinguishes the previously existing rights of all mortgagees, and of all others having common law or other rights or interests, in or to the same; and that the rights of such parties, after such sale, exist only against the proceeds of the sale; their only remedy being by application to the court for payment out of such proceeds in the order of priority which ought to be adopted in such cases. I confess that I can scarcely entertain a doubt, even after a careful examination of the cases of The Kosciusko and The Angelique, that such a sale extinguishes the lien of a mortgage (unless the decree and sale are made expressly subject to the lien), and that such lien is extinguished whether the mortgagee fails to appear in the court of admiralty, or appearing, peremptorily refuses to submit his claims and interests to the decision of the court, or to be bound by its decree; and I cannot but think. notwithstanding my high respect for the decisions of Judge Betts, that the decree and sale in the case of The Angelique, displaced, defeated and extinguished the lien of the mortgage held by the libellants in that case. That the claims of a mortgagee are extinguished by such a decree and sale, may, I think, be quite satisfactorily established; not so much, perhaps, by adjudged cases, directly in point, as by the class of authorities which declare generally that such a decree and sale are binding upon all the world, and by the other class of authorities which establish the right of a mortgagee to intervene for the protection of his interest, and contest the claim of a libellant who proceeds in rem against a vessel to enforce a maritime lien. The cases in which mortgagees have been allowed to take from the registry the surplus proceeds of such sales, after all maritime liens were paid, must likewise be considered as sustaining the same doctrine.

It appears to be well settled in England, that the high court of admiralty of that kingdom possesses, in all cases of bottomry and salvage, and also in claims for wages, which are brought before it, undoubted power to decree a sale of the vessel proceeded against, unless the demand of the successful suitor be satisfied. The jurisdiction of the court in these matters is confirmed by the municipal law of that country, and by the general principles of the maritime law; and the title conferred by the court in the exercise of this authority, is a valid title against the whole world, and is recognized by the courts of England, and by the courts of all other countries. Edw. Adm. Jur. 90, 91; The Tremont, 1 W. Rob. Adm. 163. The decree in rem binds all the world, and all parties may come in and intervene for the protection of their interests. Ben. Adm. §§ 364, 365, 434, 440; Abb. Shipp. (Perkins' Ed.) 26, and note; Conk. Adm. 556; The Mary, 9 Cranch [13 U. S.] 126, 144; The Neptune, 3 Hagg. Adm. 132, 139; The Attorney General v. Norstedt, 3 Price. 97; U. S. v. The Mangin [Case No. 14,-461]; The Mary Anne [Id. 9,195]; Whitney v. Walsh, 1 Cush. 29. The cases in which mortgagees have been allowed to intervene for their interests, and contest the claims of a libellant in admiralty, or to take the surplus of the proceeds of sale from the registry after all the maritime liens thereon have been discharged, are evidence that the courts by which such cases were decided supposed

the mortgagee was bound by the decree, and that a decree and sale displaced and extinguished his lien upon the vessel itself. If his interests as mortgagee were not to be affected by the decree and sale, there could be no propriety in allowing him to intervene and contest the claim of a libellant, or in allowing him to take from the registry any portion of the proceeds of a sale. If the sale could only be made subject to his mortgage lien he had no interest in contesting the claim of the libellant; and if a sale when made did not defeat his lien, but was necessarily made subject to its continuance, the surplus in the registry would belong, not to the mortgagee, but to the general owner; and the mortgagee should be left to enforce his prior and paramount right against the vessel mortgaged in the hands of the purchaser. The following are some of the cases in which mortgagees have been permitted to intervene for their interest, and contest claims prosecuted against a vessel on which they held a mortgage. In a case of seamen's wages, though hesitatingly: The Prince George, 3 Hagg. Adm. 376. In cases of bottomry: The Dunvergan Castle, Id. 329; The Mary [Case No. 9,187]; The Duke of Bedford, 2 Hagg. Adm. 294; and see Edw. Jur. 91. In the case of a material-man: Thomas v. The Kosciusko [Case No. 13,901]; and see The Fortitude, 2 W. Rob. Adm. 217; The Repulse, 5 Notes Cas. 348, 354; The Mary Ann, 4 Notes Cas. 376. In the last case the suit prosecuted by the holders of a bottomry bond, was contested by the holders of a common law mortgage of prior date, and Dr. Lushington said:—"I apprehend as mortgagees the defendants have a right to impeach the validity of the bond (of bottomry) to the same extent, and in the same manner as the owners, subject, perhaps, to some distinctions in peculiar cases. But it is of importance, in this and all similar cases, to remember that the title of mortgagee, is a title derivative from the owners, and in no respect, as I conceive, superior thereto." In the case of The Mary, ubi supra, the claim under a subsequent bottomry bond, was preferred to a prior common law mortgage; the holder of the latter appearing and contesting the bottomry claim. And the same decision was made in the case of The Duke of Bedford, above cited. The following are some of the cases in which mortgagees have been allowed to take from the registry surplus proceeds of sale after the maritime liens had been paid: The New Eagle, 2 W. Rob. Adm. 441; The Neptune, 3 Knapp, 94; Harper v. New Brig [Case No. 6,090]. In the cases of The Portsea, 2 Hagg. Adm. 84, and The Exmouth, Id. 88, note, the surplus proceeds remaining in the registry after the maritime claims were satisfied, were applied for by the representatives of the owners of the vessel sold, but the court refused the applications in consequence of the adverse claims of mortgagees. It is true the court did not direct the payment of the surplus proceeds to the mortgagees, but the reason for declining to make such payment was, that the court had then no jurisdiction (as it now has under the statute of 3 & 4 Vict. c. 32) to determine controversies between the mortgagee and the representatives of the general owner, and the right of a mortgagee to the surplus proceeds was fully recognized by the refusal to direct the payment of that surplus to the representatives of the general owner, and continuing to hold them as against such representatives avowedly subject to such order as should come to the court of admiralty from a common law court, or court of equity, competent to settle the questions at issue between the mortgagee and the representatives of the general owner and mortgagor. The power of a court of admiralty to sell a ship and her appurtenances, and to give a perfect title as against all common law and other liens, is also fully shown by the case of The Flora, 1 Hagg. Adm. 298. In that case the vessel had been seized by a sheriff by virtue of a fieri facias, and was in his hands at the time the warrant of arrest issued by the court of admiralty in a suit for seamen's wages was executed, and the decree in favor of the seamen being first satisfied, the surplus proceeds remaining in the registry were paid over to the sheriff to be applied upon the fieri facias. In the case of The Harmonie, 1 W. Rob. Adm. 178, the sails of a ship, which had been arrested under the warrant of arrest issued by the admiralty, under the provisions of the act of 3 & 4 Vict., for necessaries supplied to the vessel, were in the possession of a sailmaker, who had a common law lien therefor for repairs, and claimed to hold them against the process of the court. A monition was moved for and granted for the purpose of compelling the sailmaker to deliver up the sails to the person in possession of the ship under the authority of the court, and in making this decision the court said:—"Undoubtedly the sailmaker has a lien upon these sails to the amount of the repairs he has effected; and under the general law he would be justified in retaining possession of them until his debt is paid, against the owners or others seeking to dispossess him. As against the authority of this court, however, he has no right to detain them when the ship is in possession of its officer under a warrant from the court. The court can protect the sailmaker in his just rights." [And see Certain Logs of Mahogany [Case No. 2,559], where it was held that a suit in a state court by replevin, or by an attachment of the property in question, cannot supersede the right of the court of admiralty to proceed by a suit in rem, to enforce a right or lien against the property. See, also, Poland v. The Spartan [Id. 11,246], where it was held that the cargo of The Spartan, which had been attached under the attachment process of the state courts, was still liable to be arrested and held for the payment of the freight, at the instance of

seamen who had a lien for their wages upon the freight, which was a lien upon such cargo. But see Taylor v. Carryl, 20 How. [61 U. S.] 583.]² The cases cited are deemed sufficient to establish, by authority, the position that the mortgage lien is extinguished by a sale under the decree of a court of admiralty, but if we look to the nature, origin and objects of admiralty liens, and the principles of commercial policy. in which they originated, and by which they are still upheld, it will be seen that these cases are in affirmance of the general principles which have been adopted and maintained in the maritime courts of this country and Europe.

The writer of an elaborate essay on the Peculiarities of Maritime Liens, first published in the Law Magazine (English) for November, 1852, and reprinted in the Monthly Law Reporter (volume 15, p. 556), says, that the "Origin and rationale of the maritime lien are equally plain and obvious. At a period when a registry of shipping was unknown, the difficulty of ascertaining the names and residences of the owners of the vessel against which the plaintiff (whatever might be his cause of action) was interested, would have been insuperable. In our own times, where such registry does exist, the practical difficulty of ascertaining all the precise and accurate facts which are required to be known before a personal action can be brought in the form which the law necessitates is very considerable. In the case of foreign vessels it would of course amount to perfect irresponsibility or impunity on the part of their owners. No other course to protect and indemnify with facility and completeness, the suitors for wages, salvage, bottomry or damage could be imagined or contrived, but the maritime lien and its accompanying process in rem." Id. 557, 558. And again: "In the first place, a maritime lien is a debt privileged to be paid out of the res ipsa, i. e. the ship or its incidents, the cargo and freight; the condition of the privilege being that the debt shall have arisen out of such a transaction connected with the res as is cognizable in that court, e. g. wages, pilotage, towage, bottomry or damage. With these maritime liens no other debt, not even a mortgage of the vessel itself can compete. The Orelia, 3 Hagg. Adm. 83; The Hersey, Id. 407, 408. But the court of admiralty, with an entire disregard of their existence, whatever their number or amount may be, will sell the res to discharge its own peculiar liens. Nor can any other court either possess itself of the vessel, or even retain possession of it in satisfaction of debts of its own cognizance, so long as the court of admiralty has liens to enforce." When once the vessel has been arrested by the admiralty, no other tribunal can take it out of its custody. The Westmoreland, 4 Notes Cas. 174. And it is only the clear balance that may remain in

its hands, after the full payment of the maritime liens, that is subject to or available in respect of other debts, even in the case of the bankruptcy or insolvency of the owner of the vessel. A common law lien upon the res cannot be set up and maintained against a maritime lien when the res is about to be sold under the process of the admiralty, but that court, at the same time that in such a case it will forcibly dispossess those who claim to hold a vessel or her sails by virtue of a lien of that kind, (for example, dock and harbor dues, repairs or warehousing,) will protect such persons in their just rights by paying them the amount of their respective debts out of the proceeds of the sale of the res. The Harmonie, 1 W. Rob. Adm. 178.

Courts of admiralty and writers upon maritime law use the terms "maritime lien," The Globe [Case No. 5,483]; Essay on the Peculiarity of Maritime Liens, 15 Law Rep. 555–557, 590, etc.; Conkl. Adm. p. 60, "Privileged Debts"; The Paragon [Case No. 10,708], Essay, etc.; 15 Month. Law Rep. 556, 557, "Implied Liens of Privileged Creditors"; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409, "Implied Hypothecations"; Justin v. Ballam, 2 Ld. Raym. 805, "Privileged Hypothecations"; Skolfield v. Potter [Case No. 12,925], "Privileged Lien";  Id., and The Jerusalem [Case No. 7,294], "Tacit Hypothecations"; Emerigon, Contraits a la Grosse, G. R. § 2; The Rebecca [Case No. 11,619], "A Lien by the General Maritime Law"; The Paragon, ubi supra; Poland v. The Spartan [Case No. 11,246], "A Privilege against the Ship"; The Rebecca [supra], "A Lien on the Vessel"; The Rebecca and The Paragon, ubi supra, and other similar language, to express substantially the same idea. They all imply the existence of a privileged debt or demand, and of a maritime lien to secure its payment. This lien is given according to the general maritime law, and by that law the ship is considered as hypothecated to the privileged creditor in such a manner as to authorize her arrest and sale under the process and decree of a court of admiralty, at the instance of the creditor, and the application of the proceeds of such sale to the payment of the privileged debt.

The object of allowing these maritime liens is to give credit to the ship, and therefore these liens, as a general rule, bind all prior interests. This is so not only in respect to common law interests, but it is usually so in respect to previously existing maritime liens; the general rule adopted by courts of admiralty in settling the preference or right of priority of maritime liens giving preference to those of latest date. For the rule by which that priority is determined, requires that the demand or service for which that privilege is claimed be posterior in date to other liens. The ground of this inversion of rule is just and obvious. In the hazardous trade of the sea, the services performed at the latest hour are most efficacious in bring-

---

² [From 2 West. Law Month. 343.

ing the vessel and her freightage safely to their final destination. Each foregoing incumbrancer, therefore, is actually benefitted by means of the succeeding incumbrance, and the equity of the court of admiralty in adjudicating cases of conflicting liens of this nature takes that as the principle of its decisions. 16 Month. Law Rep. p. 4. In the case of St. Jago de Cuba, ubi supra, Mr. Justice Johnston said:—"The whole object of giving admiralty process and priority of payment to the privileged creditors, is to furnish wings and legs to the (in that case) forfeited hull to get back for the benefit of all concerned; that is, to complete her voyage." "It is not in the power of any one but the ship master; not the owner himself, to give these implied liens in the vessel, and in every case the last lien will supersede the preceding. The last bottomry bond will ride over all that precede it, and an abandonment to a salvor will supersede every prior claim." In the case of The Dowthorpe, 2 W. Rob. Adm. 79, Dr. Lushington is reported to have said:—"It cannot for a single moment be denied that a ship, in whosesoever hands she may be, or whoever has an interest in her, is liable to liens subsequently accruing, such for example, as salvage, bottomry bonds, and seamen's wages. These are liens upon a ship in the strictest sense of the term; and those persons who take a vessel as security, must take it subject to the incumbrances which the law may impose upon it for the benefit of third parties." These incumbrances are imposed for the benefit and encouragement of trade and commerce, and to enable the ship to obtain credit and business where her owners are unknown, or have no personal credit, and the reason and policy which gives these maritime liens as against the general owner and a subsequent bona fide purchaser without notice, and as against prior maritime liens of a similar character, apply with equal force to a case like the present. No very substantial reason has been urged why a mortgagee who allows the owner to remain in possession of the vessel mortgaged and employ it in navigation, even after forfeiture, should be placed in a better position as against seamen, bottomry bondholders material-men and freighters, than a subsequent bona fide purchaser without notice, or prior holder of another maritime lien. A mortgage is but a conditional sale, and where the mortgagee permits the mortgagor to remain in possession of the vessel and employ it in navigation, he doubtless does so to enable the mortgagee, with the profits of such employment, to redeem his mortgage. He thus expects to participate, indirectly, in the earnings of the vessel. And when the vendor of a vessel gives credit for the purchase money, and stipulates to allow the purchaser who gives a mortgage to secure its payment, to use the vessel for the purpose of earning the means of paying off the mortgage, he secures to himself a larger price for

his vessel, and should be affected by such liens as the master, the representative for this purpose of all parties interested in the ship, finds it necessary to create to ensure the profitable employment of the ship in the due and ordinary course of its business. [See The Chusan [Case No. 2,717], and The George's Creek [Id. 11,654.] [3]

The principle contended for by the claimants would give to the mortgage lien a superiority over bottomry bonds, the claims of material-men, and the holders of other maritime liens of even date; for the latter are subject to other maritime liens of the same character, subsequently accruing, while the mortgage lien is claimed to be substantially indelible. If the mortgage is thus to be preferred, how is a ship to obtain credit in a foreign port where the parties who might be willing to supply her necessities if made secure, can by no possibility of means, determine whether she is not mortgaged to her full value in the country where she belongs? And if it be established that the decree of a court of admiralty and a sale under it give no valid title as against a prior mortgagee, who will bid any thing like the full value of a ship offered for sale under such a decree? When it is once established that the right of a purchaser under such a decree is liable to be wholly defeated by a chattel mortgage, registered, filed and recorded in another country, but in respect to which, or in respect to the existence or non-existence of such mortgage, he has no means of obtaining any seasonable or reliable information, the utility and value of the maritime lien will be so far diminished, that I should doubt the policy or expediency of preserving its form after its substance had departed. Once establish this doctrine and the real owners of many, not to say most, of our vessels may be persons of wealth holding chattel mortgages thereon, while the nominal owners appearing upon the registry of the custom house, are persons of no responsibility, willing, because they have little or nothing to lose, to subject themselves to all the risks which those engaged in commerce necessarily assume.

Having heretofore discussed the question of preference among maritime liens, and incidentally their character and objects (in the case of The America [Case No. 288]) I do not propose now to pursue that discussion, but to say that I adhere to the opinions there expressed, and that the cases in our own and the English courts, then or now referred to, are in my judgment sufficient to establish the position that every creditor, who holds a maritime lien upon a ship or vessel as a security for his debt, has a "privileged debt," secured by the "hypothecation" of the vessel. These terms, "privileged debt" and "hypothecations," have a known and fixed meaning,

---

[3] [From 2 West. Law Month. 343. See note at end of case.]

both in the maritime and civil law, and if they did not have their origin in the civil law, in which it has been frequently suggested the implied hypothecation of the maritime law had its origin, they have the same effect and definition in the maritime and civil law. The learned judge of the Maine district, whose research and learning entitle his opinions to the highest respect, evidently inclines to the opinion that the maritime lien had its origin in the maritime usage of the middle ages rather than the civil law. However this may be, the privilege and the hypothecation are both well known and well defined terms of the civil law, and the precise character and effect of the marine hypothecation of a ship which secures the payment of a privileged debt against it, may, I think, be very satisfactorily ascertained by a reference to the civil law, where it treats of privileges and hypothecations. For the doctrines of the civil law on these subjects I shall refer to Domat (Little & Brown's Ed.) sections 1732, 1736, 1738, and 1769. Sec. 1732. "We must distinguish between three sorts of creditors: those who have neither mortgage nor privilege, such as he who has only a bare promise for money lent; those who have a mortgage without a privilege, as he who has an obligation for money lent, passed before notaries public; and those whose credit has some privilege that distinguishes their condition from that of other creditors, and which gives them a preference to those whose credit is prior to theirs. Thus he who has lent money to buy a house or repair it, is preferred as to that house before other creditors of the same debtor, although they have mortgages on it which are prior in date." Volume 2, p. 680. Sec. 1736. "The privilege of a creditor is the distinguishing right which the nature of his credit gives him, and which makes him to be preferred before other creditors, even those who are prior in time, and who have mortgages." Id. 681. Sec. 1738. "All the privileges of creditors have this in common, that the least of them gives the preference before creditors who are such only by writing, or by mortgage, and others who have no manner of privilege. And among those who are privileged there are some who have the preference before others, according to the different qualities of their privileges." Id. 681. Sec. 1769. "It follows from all the preceding" (contained in the sections above quoted and others,) "that among creditors there are three orders. The first is, of those that are privileged, who go before all the others, and take place amongst themselves, according to the distinctions of their preferences. The second is, of those that have mortgages who have their rank after the privileged creditors, according to the dates of their mortgages. And the third is, of creditors who have only personal actions, who not being distinguished either by privilege or mortgage, come in therefor jointly together, and share equally in proportion to their debts." Id. 694. Perhaps it was not strictly necessary in this case to resist the authority or criticise the doctrines of the cases of Thomas v. The Kosciusko and Schuhardt v. The Angelique [supra], for it strikes me that if the doctrines of those cases are carried out, their legitimate results must necessarily be to exclude the claimants from any participation in the proceeds of the sale of the Hudson. If the lien of the claimants' mortgages still exists in full force, notwithstanding the sale, if the Hudson was in law and fact actually sold subject to that lien, there can be no propriety in giving these claimants a portion of the proceeds of such sale, to the total or even partial exclusion of those who had maritime liens upon the vessel, and which, it is conceded, have been displaced and defeated by the decree and sale. I have preferred, however, to examine the questions which have been discussed, rather than to rely upon the ground just stated as the basis of my decision, for the reason that these questions are of great practical importance to those engaged in the commerce of the lakes. After a deliberate consideration of these questions I have, with some hesitation and reluctance, determined it to be my duty to dissent from the opinions of the learned judge of the Southern district in the cases of the Kosciusko and The Angelique, and I should have felt still more reluctant in doing so, if there had not been a higher tribunal before which my decision can be taken for revision. And I sincerely hope that the claimants will take this case to that higher tribunal, that the important questions involved may be finally determined and settled by the appellate court. The clerk will enter a decree for $1448.50 and interest, from the 28th Nov. 1852.

NOTE [from original report in 2 West. Law Month. 343]. February, 1855. In the case of Ruder v. The George's Creek [Case No. 11.654], in the district court of the United States for the Maryland district, Judge Giles held, that a recorded mortgage of a vessel did not take precedence of a subsequent lien obtained by a material man for necessary supplies or repairs; and he referred to a case decided in the same way by Judge Sprague, in the district court of Massachusetts, in January, 1855.